# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THERONE MAGEE | § | CIVIL ACTION NO.: 14-1554 |
| | § | |
| VERSUS | § | SECTION:  H |
| | § | |
| DISTRICT ATTORNEY WALTER REED, | § | MAGISTRATE:  1 |
| ET AL | § | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

NOW INTO COURT, through undersigned counsel, come Defendants Sheriff Randy Smith, in his capacity as Sheriff of St. Tammany Parish, successor in interest former Sheriff Rodney J. "Jack" Strain, and Deputy Christopher Comeaux (collectively "Defendants"), who respectfully submit the following Memorandum in Support of their Motion for Summary Judgment, seeking dismissal of the claims made against them by Plaintiff, Therone Magee. Each of Mr. Magee's claims against Deputy Comeaux are barred by application of *Heck v. Humphry*[1], and the Plaintiff is likewise unable to offer <u>any</u> competent summary judgment evidence to support his *Monell* claims against Sheriff Smith. Finally, the Plaintiff is unable to offer <u>any</u> evidence that would indicate any conspiracy to violate his civil rights existed among the members of the STPSO. As such, Mr. Magee's claims against Sheriff Smith and the deputies are wholly without merit and should be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Detective Stephens has previously moved for entry of summary judgment pursuant to FRCP 56 based upon the Plaintiff's claims arising out of his August 2011 arrest; however, as Mr. Magee has alleged both *Monell* and conspiracy claims against Defendants, the factual particulars

---

[1] *Heck v. Humphrey*, 512 U.S. 477 (1994).

89211/461228

of the 2011 dates bear repeating. On or about August 19, 2011, Mr. Magee was arrested by deputies of the St. Tammany Parish Sheriff's Office ("STPSO") Narcotics division pursuant to an arrest warrant issued by the 22nd Judicial District Court.[2] This warrant was signed by the Honorable Judge Allison Penzato, and the underlying probable cause affidavit supporting this warrant was sworn by Det. Brandon Stephens.[3]

*The 2011 Incident*

On April 23, 2011, a narcotics investigation was conducted by Det. Stephens along with Detective Scott Crain and Sgt. Johnny Morse, all of whom worked for the STPSO. Det. Crain participated in this investigation in an undercover capacity and participated in a controlled purchase of approximately 4.5 grams of suspected powder-cocaine alongside a Cooperating-Individual ("CI"), who helped facilitate the transaction. At the outset of this investigation on April 23, 2011, at approximately 4:00 p.m., Sgt. Johnny Morse, Detectives Brandon Stephens, Scott Crain, Thomas Schlesinger and Jed Sharp met the CI, and Det. Stephens conducted a search of the CI's person and vehicle to insure the integrity of the investigation and to make sure no weapons or contraband were located in the vehicle or on the CI.[4]

The target of this investigation was a Hispanic male subject, whom the CI knew as "Brandon," and this person was believed to be distributing retail quantities of powder cocaine in the Mandeville and Covington, Louisiana. area.[5] Following the search of the CI and his vehicle, the CI placed a ca11 to "Brandon" in the presence of Detective Stephens.[6] A meeting was arranged between the CI, "Brandon" and Detective Crain, who would be acting in an undercover

---

[2] R. Doc. 59, pg. 16, ¶ 16.
[3] *See* Rec. Doc. 83-7.
[4] Rec. Doc. 83-4, ¶¶ 8-9.
[5] Rec. Doc. 83-4, ¶ 6.
[6] Rec. Doc. 83-4, ¶ 10.

89211/461228

capacity, for the purpose of purchasing one quarter-ounce of powder cocaine for the amount of $200.00.[7]

Thereafter, Det. Crain was outfitted with a secreted audio recording device, known as a "Kel," and a plan was made to have Det. Crain ride along with the CI, in the CI's vehicle, to the target location to make a purchase of cocaine from "Brandon."[8] Detective Stephens provided Detective Crain with $260.00 in United States Currency from the Sheriff's Office Narcotics Fund.[9] The Kel allowed Sgt. Morse and Detectives Stephens, Schlesinger and Sharp to remotely monitor the transaction while conducting surveillance on the CI's vehicle and the target location from afar.[10]

At approximately 4:17 p.m., Detective Crain and the CI left the prearranged meeting location and traveled towards the apartment complex. Detectives followed the CI vehicle, keeping constant visual and audio surveillance. Detective Crain arrived at the target location at approximately 4:23 p.m. Detectives positioned themselves in various areas surrounding the area for safety purposes and to monitor the "Kel" audio device.[11] At approximately 4:23 p.m., Detective Crain arrived in the parking lot of the Mariners Village apartments, and parked near apt# 125. The CI sent "Brandon" a text message advising they had arrived at the apartments. Text messages were exchanged between the CI and Brandon regarding the sale of 4.5 grams of cocaine for $260.00.[12]

Following this text message conversation with "Brandon" regarding the price and quantity of cocaine to be purchased, "Brandon" then instructed the CI and Det. Crain to meet him

---

[7] Rec. Doc. 83-4, ¶11.
[8] Rec. Doc. 83-4, ¶11.
[9] *See* Rec. Doc.83-4, ¶12; Rec. Doc.83-6, attached C-1, p. 2;
[10] *See* Rec. Doc.83-4, ¶12; Rec. Doc.83-6, attached C-1, p. 2;
[11] *See* Rec. Doc.83-4, ¶13; Rec. Doc.83-6, attached C-1, p. 2;
[12] *See* Rec. Doc.83-4, ¶14; Rec. Doc.83-6, attached C-1, p. 2;

89211/461228

at a nearby Shell gas station to complete the purchase.[13] Following "Brandon's" instruction to meet him at the Shell station, Det. Crain advised, via the Kel, that the CI and Det. Crain had observed "Brandon" walking through the parking lot near the CI vehicle. Det. Crain described the subject as a light complexion, possible Hispanic male and stated he was walking around the apartments.[14]

Following this potential visual sighting of "Brandon," the CI then texted "Brandon" and asked whether he should then proceed to meet him at the Shell station.[15] Thereafter, "Brandon" responded: "Hold off on that. Man, that dude's tripping. I got another cat that has it for two. Be patient, I'll holla when it's all good. My bad pimp"[16] Shortly after receiving this text that "another cat" would be able to complete the transaction, another person entered the CI vehicle and engaged in conversation with Det. Crain and the CI. The subject that entered the vehicle was not the Hispanic male observed walking near the parking lot.[17]

The subject advised his name was "Mike" and completed an illegal narcotics transaction with Detective Crain by exchanging approximately four grams of what was purported to be cocaine for $260. The subject was a black male, with a small, thin mustache, and a tattoo of the state of Louisiana and words "Hot Boy" on his right outer bicep.[18] The Black Male subject also provided his phone number to Det. Crain and the CI if they desired to purchase additional cocaine later that evening.[19]

---

[13] *See* Rec. Doc.83-4, ¶15; Rec. Doc.83-6, attached C-1, p. 2; Exhibit A, Rec. Doc.83-4, attachment A-1 at 15 minutes 40 seconds.
[14] *See* Rec. Doc.83-4, ¶16; Rec. Doc.83-6, attached C-1, p. 2; Exhibit A, Rec. Doc.83-4, attachment A-1 beginning at 16 minutes 30 seconds
[15] *See* Rec. Doc.83-4, ¶17; Rec. Doc.83-4, attachment A-1 at 18 minutes 50 seconds.
[16] *See* Rec. Doc.83-4, ¶18; Rec. Doc.83-4, attachment A-1 at 20 minutes 40 seconds.
[17] *See* Rec. Doc.83-4, ¶19; Rec. Doc.83-4, attachment A-1 beginning at 22 minutes 5 seconds.
[18] *See* Rec. Doc.83-4, ¶20; Rec. Doc.83-6, attached C-1, p. 2; Exhibit A, Rec. Doc.83-4, attachment A-1 beginning at 22 minutes 5 seconds.
[19] Rec. Doc. 83-4, ¶21.

89211/461228

Immediately following the Black Male subject's exit from the vehicle, Det. Crain advised, via the Kel, that the transaction was complete.[20] Det. Crain also relayed to other officers immediately after the transaction, via the Kel, that the subject was a black male, wearing a white "wife-beater" and plaid, long shorts (red, blue, and white). Det. Crain also advised that the subject had a tattoo of the state of Louisiana and words "Hot Boy" on his right outer bicep.[21]

All parties arrived back at the prearranged meeting location at approximately 4:50 p.m. Detective Crain handed Detective Stephens a clear plastic bag containing suspected powder cocaine.[22] Detective Stephens weighed the bag which had an approximate weight of 4.5 grams.[23] Detective Stephens seized the suspected powder cocaine as evidence.[24] Detective Stephens later seized the Kel audio recording as evidence.[25]

Detective Crain advised Detective Stephens that upon arriving in the parking lot of the apartment complex, contact was made with "Brandon" via text messages.[26] Detective Crain advised that after haggling with "Brandon" over the price and amount of cocaine that they came to an agreement of 4 grams for the amount of $260.[27] Detective Crain stated that he observed "Brandon" walk past the CI vehicle and behind another set of apartments.[28] Detective Crain stated that he also observed the Black Male subject walk to the same area but lost sight of both subjects.[29] Detective Crain stated that a few moments later, the Black Male subject got into the back seat of the CI vehicle.[30] Detective Crain stated that Black Male subject handed him a clear

---

[20] Rec. Doc. 83-4, ¶22.
[21] *See* Rec. Doc.83-4, ¶22; Rec. Doc.83-4, attachment A-1 at 24 minutes 28 seconds.
[22] Rec. Doc. 83-4, ¶23.
[23] Rec. Doc. 83-4, ¶23.
[24] Rec. Doc. 83-4, ¶23.
[25] Rec. Doc. 83-4, ¶23.
[26] Rec. Doc. 83-4, ¶23.
[27] *See* Rec. Doc.83-4, ¶23; Rec. Doc.83-6, attached C-1, pp.2-3.
[28] Rec. Doc. 83-4, ¶24.
[29] Rec. Doc. 83-4, ¶24.
[30] Rec. Doc. 83-4, ¶24.

plastic bag containing suspected powder cocaine and that he handed the Black Male subject $260.00 in Unites States currency, thus completing an illegal narcotics transaction.[31] Detective Crain also informed Detective Stephens that the subject provided him with a cell phone number and instructed him to call later in the evening if he decided he wanted to purchase more cocaine.[32]

Given the description of the subject and tattoos, the area in which the transaction occurred and Detectives Stephens' knowledge from a past narcotics investigation, Detective Stephens was able to obtain a booking photo of Mr. Magee from the Sheriff's Office computerized data system.[33] Detective Stephens was able to obtain the name of Mr. Magee by running a license plate of a vehicle that was involved in a past narcotics investigation.[34] Detective Stephens ran the license plate, La. Plate # TGW 617, through the STPSO computer system which showed that Mr. Magee had been stopped on a traffic stop driving that vehicle and that the vehicle was a black Saturn VUE.[35] Detective Stephens asked Detective Crain if he had observed that vehicle in the parking lot of the apartment complex and Detective Crain stated that he had seen the Black Male subject and "Brandon" hanging out in front of apartment #125 and that there had been a black Saturn VUE parked in front of that apartment as well.[36]

Detective Stephens showed a photograph of Plaintiff, Therone Magee, to Det. Crain to determine whether the Plaintiff was the same individual who had entered the CI's vehicle to conduct the narcotics sale.[37] Detective Stephens decision to show this photo was based upon the description of the subject and tattoos, the area in which the transaction occurred and Detectives

---

[31] Rec. Doc. 83-4, ¶24.
[32] *See* Rec. Doc.83-4, ¶24; Rec. Doc.83-6, attached C-1, p. 3.
[33] Rec. Doc.83-6, attached C-1, p. 3.
[34] Rec. Doc.83-6, attached C-1, p. 3.
[35] *See* Rec. Doc.83-4, ¶25; Rec. Doc.83-6, attached C-1, p. 3.
[36] *See* Rec. Doc.83-4, ¶26; Rec. Doc.83-6, attached C-1, p. 3.
[37] Rec. Doc. 83-4, ¶27; Rec. Doc.83-6, attached C-1, p. 3.

89211/461228

Stephens' knowledge from a past narcotics investigation.[38] Detective Crain stated the subject in the picture was the same subject who had sold him the powder cocaine and executed an affidavit of identification attesting that he was familiar with the photo of Mr. Magee by personal contact during the course of the cocaine transaction earlier that day.[39]

On April 25, 2011 Detective Stephens spoke with the office of Probation and Parole, who advised that Mr. Magee was on parole. Detective Stephens was able to confirm through Probation and Parole that Mr. Magee had the exact same tattoos as Detective Crain had described on the subject who sold him the powder cocaine.[40] Furthermore, the STPSO crime laboratory concluded the substance obtained by Det. Crain during the purported drug deal was in fact cocaine HC1 (Schedule II).[41]

Following his arrest on August 19, 2011, the District Attorney charged Mr. Magee by felony bill of information with Distribution of Cocaine under La. R.S. § 40:967A(1) . On July 9, 2013, Mr. Magee was tried and acquitted of that charge.[42] Approximately 360 days after his acquittal, on July 3, 2014, Mr. Magee filed the instant §1983 lawsuit.[43]

*The 2016 Incident*

Following the institution of this action, Mr. Magee was again arrested by officers of the STPSO. In particular, in the evening hours of February 14, 2016, STPSO Deputy Chris Comeaux observed a red Toyota sedan make a left-hand turn in Mandeville, Louisiana, without stopping at

---

[38] *See* Rec. Doc.83-4, ¶27; Rec. Doc.83-6, attached C-1, p. 3.
[39] *See* Rec. Doc.83-4, ¶28; Rec. Doc.83-9.
[40] *See* Rec. Doc.83-6, attachment C-1, p. 3.
[41] Rec. Doc.83-6, attachment C-3.
[42] *See* "Charges for Docket# 512674," a copy of which is attached as Exhibit "A"; R. Doc. 53, pg. 7, ¶ 27.
[43] *See* R. Doc. 1.

89211/461228

a posted stop sign.[44] Deputy Comeaux then initiated a traffic-stop on this vehicle for its failure to stop at the stop-sign, and Mr. Magee turned out to be the driver.[45]

Deputy Comeaux obtained identifying information from both the driver and his passenger and learned that the driver was Mr. Magee, and his passenger was a woman named Skylar Landor.[46] Mr. Magee informed Deputy Comeaux that he did not have a license and that the vehicle was not his, but he did inform Deputy Comeaux that he and Ms. Landor had borrowed the vehicle from a friend while attending a wedding.[47] Because Mr. Magee was in an excited and agitated state, Deputy Comeaux had difficulty understanding how exactly Mr. Magee had come into possession of the motor vehicle.[48]

Deputy Comeaux then learned that the wedding was in the area of Monroe Street near Lamarque Street in Mandeville, and that Mr. Magee and his passenger were coming from Greenleaves Boulevard.[49] Based upon his knowledge of the area, Deputy Comeaux concluded Mr. Magee would have had no reason to turn onto Carrol Street initially and being in the area of Oak Street except to elude his patrol unit.[50] As he continued his investigation and talked with Mr. Magee, Deputy Comeaux then realized he was familiar with Mr. Magee from his time in the STPSO Narcotics Division.[51] In fact, Deputy Comeaux was familiar with the fact that Mr. Magee was someone who had sold illegal drugs in the past and may be resistant to police officers.[52]

Based upon these facts, Deputy Comeaux requested Mr. Magee exit the vehicle and place his hands on the roof of the car in order to allow the officer to conduct a pat-down for officer

---

[44] Exhibit A, Affidavit of Chris Comeaux, ¶¶4-5
[45] Exhibit A, Affidavit of Chris Comeaux, ¶7; Transportation Audio, 2:40-46 ("I understand the stop-sign and all of that.")
[46] Exhibit A, Affidavit of Chris Comeaux, ¶10.
[47] Exhibit A, Affidavit of Chris Comeaux, ¶10.
[48] Exhibit A, Affidavit of Chris Comeaux, ¶10.
[49] Exhibit A, Affidavit of Chris Comeaux, ¶11.
[50] Exhibit A, Affidavit of Chris Comeaux, ¶11.
[51] Exhibit A, Affidavit of Chris Comeaux, ¶12.
[52] Exhibit A, Affidavit of Chris Comeaux, ¶12.

89211/461228

safety.[53] Mr. Magee complied and exited his vehicle. He then placed his hands on the roof of his vehicle as Deputy Comeaux instructed.[54] Deputy Comeaux began a pat down of Mr. Magee and asked Mr. Magee if he had anything on his person that may cut, stick and/or poke [him].[55] Mr. Magee's response to this question was initially, "no."[56] However, he then suddenly reached for his pants pocket and stated he may have a pocket knife.[57]

Deputy Comeaux then immediately placed Mr. Magee's hands back onto the roof of the vehicle and asked him not to reach for anything while the pat down was being conducted.[58] During the course of this pat down, Deputy Comeaux detected the distinct odor of burnt marijuana on Mr. Magee's person, and Deputy Comeaux asked Mr. Magee if he was in possession of or using marijuana.[59] Mr. Magee responded that he was neither in possession of or using marijuana.[60] Once the pat down was complete, Deputy Comeaux escorted Mr. Magee to the rear of the vehicle and requested Ms. Landor exit.[61] Ms. Landor complied with Comeaux's request, but she became agitated that Deputy Comeaux had asked her to exit the vehicle.[62]

Deputy Comeaux then observed Ms. Landor had been sitting on a folding pocket-knife.[63] Deputy Comeaux, Mr. Magee and the passenger then waited for a secondary STPSO unit to arrive and assist; however, during their conversations, Deputy Comeaux had to instruct Mr. Magee to stand still and keep his hands on the vehicle.[64] Mr. Magee refused to follow these

---

[53] Exhibit A, Affidavit of Chris Comeaux, ¶13.
[54] Exhibit A, Affidavit of Chris Comeaux, ¶14.
[55] Exhibit A, Affidavit of Chris Comeaux, ¶14.
[56] Exhibit A, Affidavit of Chris Comeaux, ¶14.
[57] Exhibit A, Affidavit of Chris Comeaux, ¶14.
[58] Exhibit A, Affidavit of Chris Comeaux, ¶15.
[59] Exhibit A, Affidavit of Chris Comeaux, ¶16.
[60] Exhibit A, Affidavit of Chris Comeaux, ¶16.
[61] Exhibit A, Affidavit of Chris Comeaux, ¶17.
[62] Exhibit A, Affidavit of Chris Comeaux, ¶17.
[63] Exhibit A, Affidavit of Chris Comeaux, ¶18.
[64] Exhibit A, Affidavit of Chris Comeaux, ¶19

89211/461228

simple instructions; he would remove his hands from the vehicle and walk around.[65] Deputy Comeaux believed Mr. Magee was familiar with the area and suspected that Mr. Magee's behavior was an attempt to distract the deputy so that he could escape on foot when the opportunity presented itself.[66] Moments later, Mr. Magee left the rear of the vehicle and entered the driver's door of the car.[67]

Considering the knife was still on the passenger seat, Deputy Comeaux quickly relocated to Mr. Magee, grasped the rear of his shirt and escorted him back to the rear of the vehicle.[68] Due to the deteriorating situation, Deputy Comeaux removed his hand-cuffs from his belt and explained to Mr. Magee that he was not under arrest but being detained until a support unit could arrive to assist; however, Mr. Magee became combative upon hearing the sound of the handcuffs.[69] Mr. Magee attempted to pull his right hand forward and away from Deputy Comeaux and move to the front of the car, trying to free himself from Deputy Comeaux.[70]

Deputy Comeaux was then able to secure one handcuff on the right wrist; however, Mr. Magee then was able to maneuver himself from Deputy Comeaux's grip and began fighting his way towards the front of the vehicle.[71] Deputy Comeaux then regained control of Mr. Magee's right wrist and arm, but Mr. Magee then made repeated elbow strikes against Deputy Comeaux.[72] Deputy Comeaux was ultimately able to force Mr. Magee into the driver's doorway and onto the driver's seat and issued loud verbal commands to Mr. Magee requesting he stop resisting.[73] Deputy Comeaux then attempted to restrain Mr. Magee's left wrist with the handcuff; however,

---

[65] Exhibit A, Affidavit of Chris Comeaux, ¶20.
[66] Exhibit A, Affidavit of Chris Comeaux, ¶20.
[67] Exhibit A, Affidavit of Chris Comeaux, ¶21.
[68] Exhibit A, Affidavit of Chris Comeaux, ¶21.
[69] Exhibit A, Affidavit of Chris Comeaux, ¶¶ 22-23.
[70] Exhibit A, Affidavit of Chris Comeaux, ¶ 24
[71] Exhibit A, Affidavit of Chris Comeaux, ¶ 25.
[72] Exhibit A, Affidavit of Chris Comeaux, ¶ 25.
[73] Exhibit A, Affidavit of Chris Comeaux, ¶¶ 25-26.

the two's struggle continued and Deputy Comeaux sustained an abrasion to the center knuckle of the middle finger on his right hand.[74] Moments following this cut to his finger, Deputy Comeaux finally secured Mr. Magee's left wrist in handcuffs.[75]

Backup eventually arrived at 11:06 p.m. when Deputy Terry Poynter of the STPSO arrived on the scene. Deputy Comeaux then advised Mr. Magee that he was being placed under arrest for resisting an officer and battery of a police officer, and Deputy Comeaux then placed Mr. Magee into the rear of Deputy Comeaux's patrol vehicle.[76] Thereafter, Deputy Comeaux then proceeded to conduct a search of the vehicle for any contraband Mr. Magee may have been attempting to conceal (such as marijuana considering Deputy Comeaux's previous detection of the odor of burnt marijuana) as well as to collect the knife from the passenger seat.[77]

Alongside the knife, Deputy Comeaux observed several empty flavored cigar packages, which Deputy Comeaux knew were typically used by individuals to roll marijuana blunts.[78] Based upon the odor of marijuana and the presence of the empty cigar wrappers, Deputy Comeaux suspected marijuana may have been in the vehicle.[79] In the center console of the vehicle, Deputy Comeaux found a cellophane cigarette wrapper, which contained a small piece of vegetable matter.[80] The wrapper and vegetable matter were collected and submitted for scientific testing.[81] Deputy Comeaux found additional vegetable matter directly beneath the

---

[74] Exhibit A, Affidavit of Chris Comeaux, ¶ 26.
[75] Exhibit A, Affidavit of Chris Comeaux, ¶ 26.
[76] Exhibit A, Affidavit of Chris Comeaux, ¶ 27.
[77] Exhibit A, Affidavit of Chris Comeaux, ¶ 28.
[78] Exhibit A, Affidavit of Chris Comeaux, ¶ 29.
[79] Exhibit A, Affidavit of Chris Comeaux, ¶ 29.
[80] Exhibit A, Affidavit of Chris Comeaux, ¶ 29.
[81] Exhibit A, Affidavit of Chris Comeaux, ¶ 29.

89211/461228

parking brake lever and alongside the driver's seat.[82] This material was also marked and submitted as evidence for scientific analysis.[83]

Deputy Comeaux also ran a records check and learned Mr. Magee's license was suspended and he had a warrant for his arrest for failure to appear.[84] As a result, Mr. Magee was placed under arrest for the following violations:

1. La. R.S. 40:966E, Possession of a Schedule I controlled dangerous substance;

2. La. R.S. 14:34.2, Battery on a police officer;

3. La. R.S. 14:108.2, Resisting an officer with force or violence;

4. La. R.S. 32:415, Driving under suspension;

5. La. R.S. 32:57.1, Failure to appear, warrant number 393096.[85]

Deputy Comeaux then proceeded to transport Mr. Magee to the St. Tammany Parish Jail for booking on these offenses.[86] While en route, Deputy Comeaux activated his digital voice recorder and again issued the *Miranda* warning, and Mr. Magee indicated he understood the reading of his rights.[87] Mr. Magee and Deputy Comeaux talked about the events that had transpired that evening. In particular, Mr. Magee indicated he was "sorry" Deputy Comeaux had cut his finger during the encounter and that he wasn't trying to hurt the deputy.[88] Mr. Magee also told Deputy Comeaux that he was not trying to hurt the deputy because he "didn't do nothing wrong," and Mr. Magee repeated his belief that Deputy Comeaux had not done anything wrong several times.[89]

---

[82] Exhibit A, Affidavit of Chris Comeaux, ¶ 30.
[83] Exhibit A, Affidavit of Chris Comeaux, ¶ 30.
[84] Exhibit A, Affidavit of Chris Comeaux, ¶ 33.
[85] Exhibit A, Affidavit of Chris Comeaux, ¶ 33.
[86] Exhibit A, Affidavit of Chris Comeaux, ¶ 34.
[87] Exhibit A, Affidavit of Chris Comeaux, ¶ 35.Transportation Audio at 0:28-53.
[88] Transportation Audio at 1:46-2:10.
[89] Transportation Audio, at 4:45-5:30. Mr. Magee continues to repeat his belief that Deputy Comeaux had not done anything wrong to him throughout the course of this recording.

89211/461228

On April 30, 2016, the District Attorney for the 22nd Judicial District Court charged Mr. Magee via felony bill of information with one count of resisting an officer with force or violence.[90] The D.A. also charged Mr. Magee with the following counts via misdemeanor bill of information: one count of possession of marijuana –first offense, one count of battery of a police officer, one count of running a stop sign, and one count of operating a vehicle while license suspended/revoked/canceled.[91]

The State then proceeded with its prosecution of Mr. Magee on these counts. Following initial rounds of motions practice, Mr. Magee appeared in open court on June 11, 2018.[92] At that time, Mr. Magee, through counsel, asked leave of Court to withdraw his previously entered plea of not guilty and entered a plea of guilty to the charge of resisting an officer with force or violence in violation of La. R.S. 14:108.2. Mr. Magee also withdrew his pleas of not guilty the count of violating La. R.S. 40:966(1)(a)(i), possession of marijuana –first offense, as well as the count of violating La. R.S. 14:34.2, battery of a police officer and entered a plea of guilty.

On September 11, 2019, Defendants propounded requests for admissions regarding the entry of these guilty pleas.[93] In particular, Defendants requested Mr. Magee admit to the following facts:

1. That the Plaintiff entered a plea of guilty to violating La. R.S. 14:34.2 ("Battery of a police officer") on June 11, 2018;

2. That the Plaintiff's guilty plea on June 11, 2018 arose out of the events described within his Fourth Amended and Supplemental Complaint at paragraphs 32-44;

---

[90] Exhibit B, Felony Bill of Information.
[91] Exhibit C, Misdemeanor Bill of Information.
[92] Exhibit D, Transcript of June 11, 2018 *Boykin* Hearing.
[93] Exhibit E, September 11, 2019 Discovery Requests.

89211/461228

3.  That the Plaintiff entered a plea of guilty to violating La. R.S. 40:966(1)(a)(i) ("Possession of marijuana-first offense) in  conjunction with the events described within his Fourth Amended and Supplemental Complaint at paragraphs 32-44;

4.  That the Plaintiff had an opportunity to contest the validity and constitutionality the investigative stop that produced the marijuana recovered by Deputy Comeaux on February 14, 2016 prior to withdrawing his not-guilty plea and pleading guilty to possession of marijuana.

5.  That the Plaintiff had an opportunity to contest the validity and constitutionality of the vehicle search that produced the marijuana recovered by Deputy Comeaux on February 14, 2016 prior to withdrawing his not-guilty plea and pleading guilty to possession of marijuana;

6.  That Deputy Comeaux, at approximately 8:54 p.m. on February 14, 2016, did observe Mr. Magee turn left onto Villere Street from Carroll Street in Mandeville, LA without stopping at a posted stop sign;

7.  That the Plaintiff entered a plea of guilty to violating La. R.S. 40:969C ("Possesion of a Schedule IV Controlled Dangerous Substance) on June 11, 2018; and

8.  That none of the Plaintiff's June 11, 2018 guilty pleas have been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.

Thirty days passed following the propounding of these requests for admission without response from Mr. Magee. In fact, it was only on November 4, 2019 (nearly sixty days following

these requests) that Mr. Magee issued any responses[94] to this discovery; however, Mr. Magee's failure to timely respond and/or object to these requests for admission has resulted in these matters being deemed admitted.[95]

## LAW AND ARGUMENT

**I.      The Standard for Granting Summary Judgment**

Fed. R. Civ. Pro. 56 authorizes and governs the motion for summary judgment in federal court. The rule mandates that a granting of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[96] A massive body of jurisprudence has arisen regarding its application. What follows is a summary of several of those principles, along with a brief explanation of their relevance to this motion.

First, as a general rule, the moving party has the initial burden under Rule 56 of establishing that there are no issues of material fact and that it is entitled to judgment in its favor as a matter of law.[97] But the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion. Only disputed facts that might affect the outcome of the lawsuit under governing law will preclude summary judgment.[98] This principle is important here because the Plaintiff likely will point to fact issues that he asserts are still in dispute, but that are actually irrelevant to Defendant's arguments. In addition, a moving party can win summary judgment by simply pointing the court to the total absence of evidence supporting one element of

---

[94] Exhibit F, Plaintiff's untimely discovery responses.
[95] Fed. R. Civ. Pro. 36.
[96] Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91.
[97] *Breen v. Texas A&M University*, 485 F.3d 325, 331 (5th Cir. 2007); *Rivera v. Houston Independent School District*, 349 F.3d 244, 246-47 (5th Cir. 2003).
[98] *Condiff v. R.D. Werner Company, Inc.*, 2003 WL 21977167, *1 (E.D. La. 2003).

89211/461228

a non-movant's claim, if the non-movant will bear the burden of proof on that claim at trial.[99]

Second, once the mover's initial burden is satisfied, the opposition must then "go beyond the pleadings and by [their] own affidavits, or by [some other allowable means] and must designate 'specific facts showing that there is a genuine issue for trial.'"[100] A fact is material for purposes of summary judgment only when it might affect the outcome of the suit under the governing law, and a fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party based on the evidence submitted.[101] Thus, the plaintiff cannot simply rest on the allegations in his pleadings: "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[102] Third, conclusory allegations and unsubstantiated assertions unsupported by specific facts will not prevent granting of summary judgment; the plaintiff cannot rest on allegations alone to get to a jury.[103]

In fact, the Fifth Circuit requires the nonmoving party to tender what it has called "significant" and "probative" evidence in order to rebut a properly-supported summary-judgment motion.[104] Here, the Plaintiff has no significant, probative evidence in his favor. This burden placed on the non-mover to offer countervailing evidence is a heavy one.  In fact, one court has

---

[99] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[100] *Celotex Corporation v. Catrett*, 477 U.S. at 324, 106 S. Ct. at 2553, (1986), quoting Fed. R. Civ. P. 56(e); *In re Ark-La-Tex Timber Company, Inc.*, 482 F.3d 319 (5th Cir. 2007).

[101] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

[102] *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999).

[103] *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010), cert. denied --- U.S. ---, 131 S. Ct. 355, 178 L.Ed.2d 149 (2010); *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 345 (5th Cir. 2007) *Whitt v. Stephens County*, 529 F.3d 278, 283 n. 8 (5th Cir. 2008).

[104] *Whitt v. Stephens County*, 529 F.3d 278, 283 n. 8 (5th Cir. 2008).

expressed, in rather blunt terms, that summary judgment is the stage of the proceeding for plaintiffs "to put up or shut up."[105]

## II.   PLAINTIFF'S CLAIMS AGAINST COMEAUX ARE BARRED UNDER *HECK V. HUMPHRIES*

Under *Heck v. Humphrey*, a plaintiff seeking to recover for alleged constitutional violations with respect to conviction, imprisonment, or other harms caused "whose unlawfulness would render a conviction or sentence invalid must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."[106] The "core of *Heck* is a proscription against allowing a civil tort suit to cast doubt on a criminal conviction."[107] If the civil claim would contradict the conviction or sentence and the plaintiff has failed to satisfy the *Heck* requirements, the Fifth Circuit directs lower courts to dismiss the party's claims "with prejudice to their being asserted again until the *Heck* conditions are met."[108]

### *Heck* and Excessive Force Claims

The Fifth Circuit has recognized that "certain convictions will prevent a plaintiff from bringing an excessive force claim."[109] For example, "a Louisiana conviction for battery of an officer - a crime for which justification is an affirmative defense - prevents the plaintiff from

---

[105] Weinstock v. Columbia University, 224 F.3d 33, 41 (2nd Cir. 2000), cert. denied 540 U.S. 811, 124 S. Ct. 53, 157 L.Ed.2d 24 (2003), quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., CIVIL PROCEDURE 150 (2d ed.1977); see also *Ankum v. White Consolidated Industries*, 1992 WL 236961, *5 (E.D. La. 1992) ("The party moving for summary judgment need not negate an element necessary for the other's case; he simply can ask the other party to 'put up or shut up.' The opposing party then must go beyond the pleadings and offer proof of his claim.")
[106] 512 U.S. 477, 486-87 (1994).
[107] *Bush v. Strain*, 2004 U.S. Dist. LEXIS 9358, *11 (E.D. La. 2004).
[108] *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007).
[109] *See Arnold v. Town of Slaughter*, 100 Fed. Appx. 321, 323 (5th Cir. 2004).

suing for excessive force in connection with the incident."[110] Therefore, "the *Heck* determination of whether such claims are barred is analytical and fact-intensive, requiring us to focus on whether success on the excessive force claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction."[111]

In *Arnold*, the plaintiff was convicted of resisting an officer, which is a violation of La. R.S. 14:108.[112] Although the statute "provides many ways of committing the offense, the judge in the criminal trial found that Arnold resisted an officer by being hostile and threatening and by initiating confrontation."[113] Despite the judge's determination that the plaintiff was hostile, belligerent, and initiated a physical confrontation with the police, the plaintiff brought a lawsuit for the use of excessive force and alleged that he did nothing wrong and was "viciously attacked for no reason."[114] Considering the plaintiff's conviction of resisting an officer, the District Court determined that his excessive force and false arrest claims were improper challenges to his state-court conviction.[115] On appeal, the 5th Circuit affirmed and noted that the suit "squarely challenges the factual determination that underlies his conviction for resisting an officer. If Arnold prevails, he will have established that his criminal conviction lacks any basis. Therefore, this lawsuit challenges the validity of Arnold's conviction and is barred by *Heck*."[116]

In *Deleon v. City of Corpus Christi*, the plaintiff attempted to plead a claim of excessive force; however, the plaintiff had previously confessed and plead guilty to a charge of aggravated

---

[110] *Id.* (citing *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996)).
[111] *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008) (emphasis added).
[112] *Arnold*, 100 Fed. Appx. at 323.
[113] *Id.*
[114] *Id.*
[115] *Id.* at 322.
[116] *Id.* at 324-25.

assault of a police officer.[117] Even in spite of this guilty plea, Deleon's complaint maintained that "he did nothing wrong, that he simply defended himself, against mace, baton, and then gun, as the violence escalated."[118] On appeal, the 5th Circuit found that there was "no alternative pleading or theory of recovery that would allow this claim for excessive force to proceed without interfering with the Texas proceeding against Deleon for aggravated assault on an officer."[119] Therefore, the Court affirmed the District Court's decision applying *Heck* to Deleon's claims.

Here, just as in *Arnold* and *Deleon*, Mr. Magee has alleged a cause of action for excessive force and unlawful arrest related to the encounter on February 14, 2016. In particular, Mr. Magee has alleged that he was thrown by Deputy Comeaux "to the pavement forcefully, and without cause, and with no resistance."[120]  *Heck* must apply to these claims.[121] La. R.S. 14:108 requires the State to prove a defendant's "intentional interference with, opposition or resistance to…an individual acting in his official capacity and <u>authorized by law to make a lawful arrest</u> …when the offender knows or has reason to know that that the [officer]…is acting in his official capacity.[122] Therefore, Mr. Magee's guilty plea to the crime of resisting an officer contains an implicit legal conclusion: Deputy Comeaux had probable cause to effect this arrest.[123]

Mr. Magee has pleaded guilty to battery on a police officer and resisting an officer with force or violence related to the events at issue; therefore, just as in *Arnold*, this suit "squarely challenges the factual determination that underlies his conviction for resisting an officer. If [he]

---

[117] *Deleon v. City of Corpus Christi*, 488 F.3d 649, 651 (5th Cir. 2007)
[118] *Id.* at 656.
[119] *Id.*
[120] Rec. Doc. 59, ¶34.
[121] *See Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *Foster v. City of Addis*, 2014 U.S. Dist. LEXIS 156426 (M.D. La. 2014) (holding that *Heck* barred a plaintiff's assault and battery claims because they were inconsistent with her conviction for resisting an officer).
[122] La. R.S. 14:108(A).
[123] *See Johnson v. Thibodaux City*, 887 F.3d 726, 733 (5th Cir. 2018).

prevails, he will have established that his criminal conviction lacks any basis. Therefore, this lawsuit challenges the validity of [Mr. Magee's] conviction and is barred by *Heck*."[124]

*Heck* and Unlawful Search and Seizure Claims

Mr. Magee's complaint also challenges the search by Deputy Comeaux of the motor vehicle he was driving on the night of February 14, 2016. Just as with his excessive force claims, Mr. Magee's unlawful search and seizure claims must be dismissed pursuant to *Heck* as he has previously plead guilty to possession of a controlled dangerous substance that would not have been recovered if not for the very searches that are now challenged in this action.[125]

Mr. Magee is unable to show that the stop and search of the motor vehicle was itself unlawful, and this failure alone forecloses any claims under § 1983 related to the search. Notwithstanding the propriety of this search, Mr. Magee's claims regarding this search must nonetheless be dismissed pursuant to *Heck* as the evidence obtained from this search formed the underlying factual basis for his guilty plea. As such, Mr. Magee cannot collaterally attack the propriety of this search until his state court conviction for possession of a controlled dangerous substance is expunged or otherwise set aside.

## III.    ALL OFFICIAL CAPACITY CLAIMS SHOULD BE DISMISSED

Sheriff Smith is sued in his official capacity.[126] A suit against a government official in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." [127] "It is *not* a suit against the official personally, for the real

---

[124] Arnold, 100 Fed. Appx at 324-25; see also Price v. City of Rayne, 2016 U.S. Dist. LEXIS 27909 (W.D.La. Mar. 3, 2016) ("[W]hen a plaintiff contends that he did not resist arrest, that is, that he committed no offense and was instead unjustly victimized, the Fifth Circuit has uniformly concluded that his excessive force claim is Heck barred because the excessive force claim necessarily attacks the validity of the conviction for resisting arrest.").

[125] *See* Exhibit E, p. 19, ll. 24-32, p. 20, ll. 1-6.

[126] Rec. Doc. 59, ¶5(D).

[127] *Ky. v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 5).

89211/461228

party in interest is the entity."[128]   "[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."[129] "[E]very sheriff in Louisiana is a political subdivision unto himself, and there is no such thing as a 'Parish Sheriff's Department' or 'Parish Sheriff's Office.'"[130] Thus, "official capacity claims" against Sheriff Smith are really claims against the St. Tammany Parish Sheriff—a political subdivision of the State of Louisiana.[131]

The United States Supreme Court has said that "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983."[132]   In other words, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[133]

The Fifth Circuit has defined official policy or custom as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.[134]

---

[128] *Id*. at 166 (emphasis original).
[129] *Id*.
[130] *Powe v. May*, 2003 U.S. App. LEXIS 28628, pp. 2–3 (5th Cir. 2003) (citations omitted); *see also Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F. 3d 273, 283 (5th Cir. 2002) (same proposition).  Sheriff Smith is, for all intents and purposes, the "political subdivision."
[131] *See* La. Const. art V, § 27; La. R.S. 13:5102.B.
[132] *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694).
[133] *Monell*, 436 U.S. at 694.
[134] Johnson, 958 F. 2d at 94 (citation omitted).

Here, Mr. Magee is unable to introduce any evidence to show that his alleged constitutional injuries were actually caused by any official policy or custom of the STPSO. In fact, considering Mr. Magee is unable to withstand summary judgment on either of the individual claims raised against the STPSO deputies, this Court may summarily dispose of any claims to *Monell* liability as the Plaintiff cannot shown any violations of his rights under § 1983 committed by STPSO members. All such claims should be dismissed, with prejudice.

## IV.    DEPUTY COMEAUX IS ALSO ENTITLED TO QUALIFIED IMMUNITY

To the extent the Court holds any claim against Deputy Comeaux is not barred under *Heck*, Deputy Comeaux nonetheless is entitled to the protections of qualified immunity. The general rules regarding summary judgment are even further manifest when dealing with claims asserted under § 1983 where the defendant raises qualified immunity as a defense, as this Defendant has done here. As summarized by one court:

> The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. Although qualified immunity is called an affirmative defense, the defendant asserting qualified immunity does not have the burden to establish it. Rather, *it is the plaintiff whose burden it is to negate the assertion of qualified immunity, once it is raised*. An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated *clearly established law*. The plaintiff, bearing the burden of negating the defense, cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.[135]

As this Court has stated, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" in situations in which "existing precedent . . . placed the

---

[135] *Tolan v. Cotton*, 854 F.Supp.2d 444, 463 (S.D. Tex. 2012)(emphasis added)(internal citations omitted), affirmed 713 F.3d 299 (5th Cir. 2013), reversed on other grounds --- U.S. ---, 134 S. Ct. 1861, 188 L.Ed.2d 895 (2014) (emphasis added).

statutory or constitutional question beyond debate."[136] To defeat the defense of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[137]

As noted by the United States Supreme Court, while qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[138] This "clearly established law should not be defined 'at a high level of generality.'"[139] Instead, it must be "particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." [140] This burden requires Plaintiff to identify a "case where an officer acting under similar circumstances as [each of the defendants] was held to have violated the [a person's constitutional rights]."[141] An "an "allegation of malice is not sufficient to defeat [qualified] immunity if the defendant acted in an *objectively reasonable* manner."[142]

The undisputed material facts here plainly show Deputy Comeaux acted reasonably at all times during this encounter. "Probable cause to arrest exists 'where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'"[143]

---

[136] *Whitney v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citations omitted.
[137] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).
[138] *White v. Pauly*, --- U.S. ---, 137 S. Ct. 548, 551 (2017).
[139] *Id*. at 552.
[140] *Id*.
[141] *Id*.
[142] Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986) (emphasis added).
[143] *United States v. Lee*, 962 F.2d 430, 435 (5th Cir. 1992) (quoting *United States v. Preston*, 608 F.2d 626, 632 (5th Cir.1979)).

89211/461228

Where, as here, an officer asserts the defense of qualified immunity on such a claim, "there must not even arguably be probable cause for the search and arrest for immunity to be lost" because "qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."[144] Thus, in evaluating a false arrest claim in which the defendant has asserted a qualified immunity defense at the summary judgment stage, the Court must assess the summary judgment evidence and determine whether "a reasonable officer could have concluded that there was probable cause upon the facts then available to him."[145] The burden of overcoming a defendant's assertion of qualified immunity rests with the plaintiff.[146]

The reasonable and trustworthy information available to Deputy Comeaux at the time he arrested Mr. Magee suggested that Mr. Magee had committed at least several crimes. As such, probable cause existed for the Plaintiff's arrest. Therefore, the Plaintiff's claims with respect to Deputy Comeaux's investigation, his arrest, and his pre-trial detention must be dismissed as probable cause supported the Plaintiff's arrest and existed for the proceedings against the Plaintiff. As such, Deputy Comeaux is alternatively entitled to qualified immunity.

## V.   MR. MAGEE'S CONSPIRACY CLAIMS AGAINST DEPUTY COMEAUX MUST BE DISMISSED

42 U.S.C. § 1983 does not create substantive rights; instead, it provides a right of action for violation of statutory and constitutional rights.[147]   A plaintiff must show that he has asserted a recognized liberty or property interest within the purview of the constitution, and that he was

---

[144] *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (internal quotations omitted).

[145] *Brown*, 243 F.3d at 190; *see Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (under the second or "clearly established" prong of the qualified immunity analysis, "if the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the [qualified] immunity defense").

[146] *See Floyd*, 351 Fed. Appx. at 893.

[147] *McGregor v. Louisiana State University Board of Supervisors*, 3 F.3d 850, 867 (5th Cir. 1993) (citing *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979).

89211/461228

intentionally or recklessly deprived of that interest by a person acting under color of state law.[148] Furthermore, Mr. Magee has sued Sheriff Smith only in his official capacity as the Sheriff of St. Tammany Parish; however, to the extent the Mr. Magee attempts to argue he has sued Sheriff Smith individually under the very same conspiracy theory as discussed in this section, such claims must be dismissed for the reasons set out herein vis-à-vis Deputy Comeaux.

First, even though conspiracy claims under § 1983 need not meet a "probability requirement at the pleading stage," plaintiffs must meet the *Twombly* "plausibility requirement" by pleading enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.[149] In other words, plaintiffs' facts, when placed in a context, must raise "a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[150]

Here, even under the most liberal interpretation of Mr. Magee's several and amended complaints, Mr. Magee has failed to meet his burden of pleading enough facts to raise an expectation that discovery will reveal evidence of an illegal agreement between Det. Stephens, Deputy Comeaux and the STPSO or with members of the St. Tammany Parish District Attorney's Office. Indeed, except for Mr. Magee's own self-serving, conclusory allegations suggesting that a conspiracy existed, Mr. Magee has failed to plead ***even a single fact*** that would plausibly support a claim for conspiracy. At most, what little Mr. Magee has pleaded would only amount to conduct that could just as well be independent action.

Mr. Magee has failed to plead anything more than conclusory statements alleging a conspiracy, and he is unable to offer <u>any</u> evidence to show the existence of any agreement

---

[148] *Walton v. Alexander*, 44 F. 3d 1297 (5th Cir. 1995); *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990).
[149] *Jabary v. City of Allen*, 547 Fed. Appx. 600, 610, 2013 U.S. App. LEXIS 23628, *26, 2013 WL 6153241; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2006).
[150] *Jabary v. City of Allen*, 547 Fed. Appx. 600, 610, 2013 U.S. App. LEXIS 23628, *26, 2013 WL 6153241.

between any of the STPSO defendants and/or members of the District Attorney's office. "Unsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim."[151] Accordingly, Mr. Magee's conspiracy claims against the STPSO defendants must be dismissed with prejudice based on Mr. Magee's total lack of any evidence to support a conspiracy.

## VI.   PLAINTIFF'S EQUAL PROTECTION CLAIMS AGAINST DEPUTY COMEAUX MUST BE DISMISSED

Mr. Magee has also alleged violations to his Fourteenth Amendment right to equal protection. In particular, Mr. Magee has alleged numerous times within his complaint that "Defendants Concerted Unlawful and Malicious Subsequent Arrests and Charges deprived Mr. Magee of his liberty . . . and his right to equal protection of the laws."[152] Mr. Magee makes no specific allegation of any action taken by Deputy Comeaux that violated his right to equal protection.

First, this Court should dismiss any Equal Protection claims against Deputy Comeaux as Mr. Magee has failed to comply with the pleading standards set out by the Supreme Court in *Twombly* and *Iqbal*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[153] All of the factual allegations merely state that the defendants undertook their wrongful activities because of Mr. Magee's race, yet he fails to elaborate on the causal connection between his alleged mistreatment and his membership in this protected class. Although his statements are consistent with an equal protection claim, they fail

---

[151] *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455 (5th Cir. 1998) (internal citations omitted).
[152] *See e.g.,* Rec. 59, pg. 11, ¶ 60.
[153] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

89211/461228

to "'nudge his claim of purposeful discrimination across the line from conceivable to plausible.'"[154]

Second, even if the Plaintiff had pleaded with sufficient particularity to state an equal protection claim against Deputy Comeaux, which is denied, any such claims must be dismissed as the Plaintiff cannot put forward any evidence to show he received treatment different from other similarly situated persons or that this alleged unequal treatment stemmed from discriminatory intent.[155] Absent any evidence to support differential treatment or discriminatory animus vis-à-vis Deputy Comeaux, any such equal protection claims against him must be dismissed.

## VII. THIS COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER ANY REMAINING STATE LAW CLAIMS.

In addition to the numerous § 1983 claims filed by Plaintiff, Plaintiff has also asserted various claims under Louisiana State law, including claims for "false arrest, false imprisonment, assault, battery and extortion, malicious prosecution, race-based prosecution, retaliation and others . . . ."[156] Defendants respectfully suggest that they are entitled to this Motion for Summary Judgment to dismiss **all** of Plaintiff's claims, including Plaintiff's § 1983 and state law claims. St. Tammany Parish Sheriff's Deputies are authorized and empowered by a governmental entity (the Sheriff) to perform duties which relate to the governmental function of maintaining peace and order.[157] The decision to issue a summons or make an arrest normally lies within the

---

[154] *Iqbal*, 556 U.S. at 683 (quoting Twombly, 550 U.S. at 570).

[155] *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 227 (5th Cir. 2012) ("To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff must allege and prove that she received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.").

[156] *See*, R. Doc. 59, pg. 17, ¶ 87.

[157] *Persilver v. Louisiana Dept. of Transp.*, 592 So. 2d 1344, 1349 (La. App. 1st Cir. 1991) (*citing Nichols v. Nichols*, 556 So. 2d 876, 878 (La. App. 2d Cir.), writ not considered, 561 So. 2d 92 (La. 1990)).

89211/461228

discretion of law enforcement officials, and therefore, the exercise of that discretion should not result in civil liability.[158]

However, in the event that this Court dismisses Plaintiff's § 1983 claims and some, but not all, of Plaintiff's state law claims, Defendants respectfully request that this court decline to exercise supplemental jurisdiction over any of the remaining state law claims. Defendants' request is based on 28 U.S.C. § 1367(c), which permits a court, in its discretion, to decline to exercise supplemental jurisdiction over a claim when the court has dismissed all claims over which it has original jurisdiction.

## <u>CONCLUSION</u>

For these reasons, Defendants, Sheriff Smith and Deputy Comeaux, respectfully submit there are no genuine issues of material fact and that they are entitled to summary judgment dismissing all state and federal law claims levied against them in this action.

**Respectfully submitted,**

**MILLING BENSON WOODWARD, LLP**

*s/ Chadwick W. Collings*
**CHADWICK W. COLLINGS (#25373)**
**ANDREW R. CAPITELLI (#31649)**
**CODY J. ACOSTA (#37005)**
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**Telephone:     (985) 292-2000**
**Facsimile:     (985) 292-2001**
**ccollings@millinglaw.com**

*Attorneys for Sheriff Smith and Chris Comeaux*

Dated: December 3, 2019

---

[158] La. C.Cr.P. art. 213; La. R.S. 9:2798.1(B); Millet v. Jacques, 2011-0247 (La. App. 1 Cir. 9/19/11), 2011 La. App. Unpub. LEXIS 561, 2011 WL 4349402 (unpublished).

89211/461228