UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **THERONE MAGEE** | **CIVIL ACTION** |
| **VERSUS** | **NO: 14-1554** |
| **WALTER REED, ET AL** | **SECTION: "H"(1)** |

ORDER AND REASONS

Before the Court is Defendant Brandon Stephens's Motion for Summary Judgment (Doc. 83). For the following reasons, the Motion is **GRANTED**.

BACKGROUND

This case arises out of the arrest and criminal prosecution of Plaintiff Therone Magee. Plaintiff alleges broadly that St. Tammany law enforcement officials worked together to violate his civil rights. On April 23, 2011, Defendant Brandon Stephens, a detective with the St. Tammany Parish Sheriff's Office, led an investigation into the sale of powder cocaine. The target of the investigation was a Hispanic male known as "Brandon." Defendant Stephens arranged for a controlled purchase of approximately 4.5 grams of cocaine from "Brandon" at an apartment complex in Mandeville, Louisiana with an undercover officer and a cooperating individual ("CI"). Defendant Stephens provided the undercover officer with $260 to purchase the cocaine. The CI texted "Brandon" once they arrived at the apartment complex in the CI's vehicle. After exchanging text messages with "Brandon" regarding the

1

price and quantity of cocaine to be purchased, "Brandon" instructed the CI and officer to meet at a Shell gas station, instead of the parking lot, for the exchange. The undercover officer then observed a male of possible Hispanic descent walking through the parking lot. Shortly after that, a black male entered the CI's vehicle and completed the transaction. The male introduced himself as "Mike." The undercover officer described him as having a small, thin mustache and a tattoo of the state of Louisiana with the words "Hot Boy" on his right bicep. He wore a white "wife-beater" and plaid, long shorts that were red, blue, and white. "Mike" gave the undercover officer his phone number to contact him for future cocaine purchases.

After the controlled purchase, Defendant Stephens met with the undercover officer. The undercover officer advised Stephens about what transpired and described "Mike's" appearance. Stephens weighed the drugs at approximately 4.5 grams and submitted them to the crime lab for analysis. According to the undercover officer, "[g]iven the description of the subject and tattoos, the area in which the transaction occurred and Detective Stephens' knowledge from a past narcotics investigation, Detective Stephens was able to obtain a booking photo of Mr. Magee from the Sheriff's Office computerized data system."[1] Defendant Stephens then showed a photograph of Plaintiff to the undercover officer to see if this was "Mike," who entered the car earlier at the controlled purchase. The undercover officer confirmed that it was. Two

---

[1] Doc. 83-4 at 5. Stephens was "able to obtain the name of Mr. Magee by running a license plate of a vehicle that was involved in a past narcotics investigation." *Id*. The search showed that "Mr. Magee had been stopped on a traffic stop [while driving] a black Saturn VUE." *Id*. Defendant Stephens asked the undercover officer if he saw that specific vehicle while in the apartment complex parking lot, and the officer confirmed that he had.

days later, Stephens spoke with the office of Probation and Parole, who advised that Plaintiff was on parole and that he had the same tattoo seen on "Mike."

In May, the lab results came back and showed that the substance tested positive for cocaine.[2] Notably, the substance that tested positive for cocaine weighed 3.25 grams, not 4.5 grams.[3] After receiving the lab results, Defendant Stephens appeared before Judge Allison Penzato on May 13, 2011 and executed an affidavit for an arrest warrant. The affidavit stated that "Therone Magee . . . distributed approximately 4.5 grams of suspected powder cocaine."[4] Judge Penzato then issued an arrest warrant, and Plaintiff was arrested on August 19, 2011. The St. Tammany Parish District Attorney charged Plaintiff by felony bill of information with distribution of cocaine. Plaintiff was tried and acquitted on July 9, 2013, after being confined to pretrial detention for the pendency of his trial.

Plaintiff brings this action against numerous Defendants[5] pursuant to 42 U.S.C. § 1983 and Louisiana state law for alleged Fourth Amendment, Due Process, and Equal Protection violations. As to Defendant Stephens, Plaintiff asserts that he "contributed to Magee's wrongful arrest and prosecution . . . by . . . conducting a suggestive one-photo line-up and later creating a false affidavit for an arrest warrant."[6] Plaintiff brings federal claims against Stephens for unlawful arrest, unlawful detention, malicious prosecution,

---

[2] Doc. 83-6 at 9.
[3] *Id.*
[4] Doc. 83-7 at 1.
[5] The defendants in this matter are Walter Reed, in his individual capacity and official capacity as District Attorney for St. Tammany Parish; Rodney Strain, Jr., in his capacity as Sheriff of St. Tammany Parish; Ronald Gracianette; Jason Cuccia; St. Tammany Parish District Attorney's Office; St. Tammany Parish Sheriff's Office; Christopher Comeaux; Randy Smith in his capacity as successor in interest of former Sheriff Rodney Strain, Jr.; and Brandon Stephens.
[6] Doc. 88 at 1.

3

conspiracy, due process violations, and equal protection violations and similar state law claims. Defendant Stephens now moves this Court for dismissal of all claims against him.

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[8] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[10] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[11] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[12]

---

[7] FED. R. CIV. P. 56.
[8] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[9] *Id.* at 248.
[10] Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).
[11] Engstrom v. First Nat'l Bank, 47 F.3d 1459, 1462 (5th Cir. 1995).
[12] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[13] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[14] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[15]

## LAW AND ANALYSIS

Defendant Stephens raises numerous arguments in favor of dismissing the claims against him. The Court will address each in turn.

### I. Qualified Immunity

First, Defendant Stephens asserts that Plaintiff's § 1983 claims against him should be dismissed because he is entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[16] "There are generally two steps in a qualified immunity analysis."[17] "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a

---

[13] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[14] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[15] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[16] Heaney v. Roberts, 846 F.3d 795, 801 (5th Cir. 2017) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).
[17] Id. (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

5

[statutory or] constitutional right. Second . . . the court must decide whether the right at issue was clearly established at time of [the] defendant's alleged misconduct."[18] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"[19]

Plaintiff asserts that his Fourteenth Amendment due process rights were violated when Defendant Stephens conducted a one-photo witness identification with the undercover officer, and his Fourth Amendment rights were violated when Defendant Stephens submitted a facially false affidavit in order to secure an arrest warrant for Plaintiff. The Court addresses each in turn.

### A. Witness Identification Photo Lineup

The Court first must address the question of whether showing a single photograph of a suspect to a witness in a preindictment setting constitutes a violation of due process rights secured by the Fourteenth Amendment. Then, the Court must decide whether such a violation was clearly established at the time Defendant Stephens showed the undercover officer the picture.

In *Neil v. Biggers*, the Supreme Court held that "[i]t is the likelihood of misidentification which violates a defendant's right to due process."[20] "An identification procedure is unduly suggestive if, during the procedure, a witness's attention is focused on the defendant."[21] "Assuming that there was a

---

[18] *Id.* (citing *Pearson*, 555 U.S. at 232) (internal quotations omitted).
[19] Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).
[20] 409 U.S. 188, 198 (1972).
[21] State v. Jones, 658 So. 2d 307, 311(La. App. 1 Cir. 1995), *writ denied*, 666 So. 2d 320 (La. 1996) (citing State v. Hawkins, 572 So. 2d 108, 112 (La. App. 1 Cir.1990)).

suggestive identification procedure, courts must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification."[22] The factors used to determine whether a suggestive identification presents a substantial likelihood of misidentification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.[23]

Here, the procedure for identification employed "was both suggestive, because only one photograph was used, and unnecessary, because there was no emergency or exigent circumstance involved."[24] Having found that the single-photo lineup was unduly suggestive and unnecessary, the Court now turns to the factors enumerated above "to determine whether [the undercover agent's] ability to make an accurate identification outweighs the corrupting effect of the challenged identification procedure."[25] If so, the identification procedure has a low likelihood of misidentification, and Plaintiff's Fourteenth Amendment due process rights are not violated.

> 1. *The opportunity of the witness to view the criminal at the time of the crime*

The undercover officer was present in the vehicle when "Mike" entered the vehicle and conducted the controlled purchase of drugs. The transaction occurred during the afternoon. The transaction was relatively short in time.

---

[22] State v. Martin, 595 So. 2d 592, 595 (La. 1992).
[23] *Id.* (citing *Biggers*, 409 U.S. at 199–200).
[24] *Id.* (citing *Brathwaite*, 432 U.S. at 109).
[25] *Id.*

*2. The witness's degree of attention*

The witness in this case is not a layperson or casual observer, but a trained police officer working in the narcotics division of the St. Tammany Parish Sheriff's Office. The witness was present in the vehicle for the specific purpose of conducting an investigation, and so he paid a high degree of attention to "Mike" as part and parcel of his investigation. There are no facts suggesting that the witness was distracted or unable to view "Mike."

*3. The accuracy of his prior description of the criminal*

Shortly after "Mike" exited the vehicle, the undercover agent used his audio recording device to relay his description of "Mike" to Defendant Stephens. The description included "Mike's" race, hairstyle, facial hair, clothing, and visible tattoos. The undercover agent did not, however, make any mention of gold teeth, a clear and distinctive feature of Plaintiff.

*4. The level of certainty demonstrated at the confrontation*

The only evidence of the undercover officer's level of certainty presented to this Court is the fact that he executed an affidavit of identification, attesting to know that the photograph presented to him is a picture of Therone Magee, and he knows this by "personal contact."[26]

*5. The time between the crime and the confrontation*

The confrontation occurred four and a half hours following the undercover officer's initial contact with "Mike."

This Court also notes that another consideration is whether the witness-officer was under pressure to acquiesce in the suggestion of identification that

---

[26] Doc. 83-5.

8

a single photo entails.[27] If the officer can view the photograph at his leisure and examine it alone without any coercive pressure to make an identification, then the identification is more reliable.[28]

In the Louisiana Supreme Court case *State v. Martin*, the undercover officer made an identification of a suspect after viewing a single photograph.[29] The officer had ample opportunity to view the suspect while conducting a controlled purchase in a car at 6:35 p.m.[30] The officer testified that he paid a good deal of attention to the suspect but did not recall some specific identifying details of the suspect, and the officer's description of the suspect was incorrect as to every attribute except race and gender.[31] The officer stated he was absolutely certain of his photographic identification and never wavered.[32] The officer made the identification approximately one month after he made contact with the suspect.[33] As to coercive pressure to make the identification, the officer viewed the photograph at the request of the leading detective, in her presence, and not at his own leisure.[34] Moreover, the officer's personnel records indicated that he had difficulties with his inability to "make big cases."[35] The Louisiana Supreme Court found that the indicators of the officer's "ability to

---

[27] *Martin*, 595 So. 2d at 596 (citing *Brathwaite*, 432 U.S. at 116) ("In addition to the listed factors, the *Brathwaite* Court dealt with whether the officer was under 'pressure . . . to acquiesce in the suggestion that such a [single-photograph] display entails.'" (internal ellipses and brackets in original)).
[28] *Id.*
[29] *Id.* at 595.
[30] *Id.* at 595–96.
[31] *Id.* at 596.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

9

make an accurate identification are significantly outweighed by the corrupting effect of the single-photograph identification."[36]

In this case, the identification was made hours, not weeks, after the initial contact, and the undercover officer *did* correctly note some key identifying features like the suspect's race, age, size, facial hair, and tattoos. These key features were relayed to Defendant within minutes of "Mike" exiting the vehicle. While the officer did make the identification at the request and in the presence of Defendant Stephens, there are no additional factors, like work pressures faced by the undercover officer, that would further coerce him to make an identification, as was the case for the officer in *Martin*.

This Court finds that the undercover agent's ability to make an accurate identification outweighed the corrupting effect of the single-photograph identification procedure. Thus, the likelihood for misidentification was low, and Plaintiff did not suffer a violation of his Fourteenth Amendment due process rights. Accordingly, Defendant Stephens is entitled to qualified immunity as to Plaintiff's due process claims.

### B. Arrest Warrant Affidavit

Next, the Court must determine whether Plaintiff suffered a violation of his Fourth Amendment rights when Defendant Stephens executed a facially-false affidavit to secure an arrest warrant for Plaintiff, and then, whether that right was clearly established at the time it was violated.

The drugs that were exchanged between "Mike" and the undercover officer were weighed by Defendant Stephens the same day at 4.5 grams. The "request for narcotics analysis" identifies the substance as being 4.5 grams. On May 4, 2011, the substance was weighed and tested by the crime lab. The crime

---

[36] *Id.*

lab report shows that "one (1) clear plastic bag containing 3.25 grams of white material . . . was determined to contain cocaine."[37] Then, on May 13, 2011, Defendant Stephens executed an Affidavit for Arrest Warrant of Plaintiff. The affidavit states "Therone Magee (b/m d.o.b. 02-13-84) distributed approximately 4.5 grams of suspected powder cocaine . . . thus completing an illegal narcotics transaction."[38] Relying on that affidavit, Judge Allison Penzato issued an arrest warrant for Plaintiff for illegally distributing cocaine. Plaintiff was arrest in August 2011 and then charged with distribution of a schedule II controlled dangerous substance.

"When an individual asserts a claim for wrongful arrest, qualified immunity will shield the defendant officers from suit if a reasonable officer could have believed [the arrest at issue] to be lawful, in light of clearly established law and the information the [arresting] officers possessed."[39] "Thus, a qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause."[40] As to officers applying for arrest warrants, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost."[41] "Probable cause to arrest exists where the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are]

---

[37] Doc. 83-6 at 9.
[38] Doc. 83-7 at 1.
[39] Mendenhall v. Riser, 213 F.3d 226, 230 (5th Cir. 2000) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)) (internal quotation marks omitted; brackets in original).
[40] *Id.* (citing Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994)).
[41] Malley v. Briggs, 475 U.S. 335, 344–45 (1986) (citing United States v. Leon, 468 U.S. 897, 923 (1984)).

11

sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[42]

Plaintiff argues that there was no probable cause for the issuance of his arrest warrant because the evidence that tested positive for cocaine was not the evidence seized from the April 23, 2011 investigation. Defendant argues that the "reasonable and trustworthy information available to Det. Stephens at the time he went before Judge Penzato suggested that the Plaintiff had committed a crime."[43] Defendant cites the following seven reasons for his "reasonable belief" that a crime had been committed by Plaintiff: (1) he conducted surveillance of the controlled purchase; (2) he monitored the purchase with an audio recording device; (3) he spoke with the undercover officer immediately following the purchase about "Mike's" identifying features; (4) the undercover officer identified the photo of Plaintiff as "Mike;" (5) the undercover officer executed an affidavit of identification that Plaintiff was "Mike;" (6) he corroborated tattoo information with the office of Probation and Parole; and (7) he "received certification from the STPSO crime lab that the white substance obtained by [the undercover officer] in the controlled purchase was, in fact, cocaine."[44]

The only evidence that Plaintiff provides to demonstrate that the drugs seized were not the drugs tested is the discrepancy in the weights at the time of seizure and at the time of testing. Defendant Stephens notes in his reply that the case narrative he authored states that he "weighed the bag" *with* the

---

[42] United States v. Kye Soo Lee, 962 F.2d 430, 435 (5th Cir. 1992) (quoting United States v. Preston, 608 F.2d 626, 632 (5th Cir. 1979), *cert. denied*, 446 U.S. 940 (1980)) (internal quotation marks omitted; brackets in original).
[43] Doc. 83-3 at 13.
[44] *Id.* at 12.

drugs,[45] while the lab only weighed the drugs themselves without the bag. This could presumably explain the discrepancy between the weights. The burden rests with the Plaintiff to show that the substance tested was not the same substance seized and that the Defendant acted unreasonably. This Court finds, however, that Plaintiff fails to demonstrate that Defendant Stephens did not act in good faith when he executed the warrant application. The chain of custody of the drugs, from seizure to testing, was never broken, so Defendant Stephens had no reason to believe that the drugs tested were not the drugs seized.[46] Further, Defendant Stephens could have, in good faith, believed that the discrepancy in weights was attributable to the weight of the bag. Defendant Stephens could have reasonably believed that probable cause existed based on the sum total of the information he possessed. This is not a case where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. Accordingly, Defendant is entitled to the defense of qualified immunity as it relates to Plaintiff's Fourth Amendment claims.

## II. No Free-Standing Federal Claim for Malicious Prosecution

Next, Defendant argues that Plaintiff's claim against him for malicious prosecution is not a cognizable § 1983 claim. Defendant notes that the Fifth Circuit has held that a claim of malicious prosecution, standing alone, does not violate the Constitution. Indeed, "causing charges to be filed without probable cause will not without more violate the Constitution. So defined, the assertion of malicious prosecution states no constitutional claim."[47] Plaintiff provides no

---

[45] Doc. 83-6 at 4.
[46] *See id.* at 8.
[47] Castellano v. Fragozo, 352 F.3d 939, 953 (5th Cir. 2003) (en banc).

13

argument to the contrary. Accordingly, Plaintiff's claims against Defendant Stephens for malicious prosecution must be dismissed.

### III. Federal False Arrest Claim Has Prescribed

Defendant Stephens next argues that Plaintiff's false arrest claim has prescribed. The Court need not address this argument, however, as Defendant Stephens is entitled to the defense of qualified immunity as it relates to this claim.

### IV. Federal Wrongful Imprisonment Claim Fails as a Matter of Law

Defendant argues that Plaintiff's § 1983 wrongful imprisonment claim should be dismissed because his prosecution was predicated upon probable cause. Defendant correctly notes that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process."[48] Defendant argues that because Defendant had probable cause to believe that Plaintiff had committed a crime, his Fourth Amendment wrongful imprisonment claim fails as a matter of law. This Court agrees. Plaintiff's imprisonment was predicated upon his arrest, and this Court has already determined that Defendant Stephens had a good faith, reasonable belief that probable cause existed. Accordingly, the Court holds that Plaintiff's wrongful imprisonment claim fails as a matter of law.

### V. Federal Conspiracy Claim is Insufficiently Pleaded and is Prescribed

Defendant next asserts that Plaintiff has failed to plead any facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement and that Plaintiff failed to provide any evidence in support of a

---

[48] Manuel v. City of Joliet, 137 S. Ct. 911, 920 (2017).

14

conspiracy claim. Plaintiff failed to respond to this argument in his opposition to Defendant's motion.

"The elements of a civil conspiracy are (1) an actual violation of a right protected under Section 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right."[49] Plaintiff fails to put forth any argument or evidence whatsoever in support of his conspiracy claim. Indeed, Plaintiff fails to identify what specific constitutional right(s), if any, Defendants conspired to violate. Without any evidence of "action taken in concert by the defendants with the specific intent to violate" constitutional rights, this Court finds that there is no disputed issue of material fact as to Plaintiff's conspiracy claims, and they are appropriately dismissed.

## VI. Due Process Claim is Improper in this Matter

Defendant next asks this Court to dismiss all due process claims raised by Plaintiff against Defendant, arguing that the Supreme Court has held that the Fourth Amendment governs claims relating to pretrial deprivations of due process rights. Defendant argues, therefore, that Plaintiff's claims "with respect to his arrest and pre-trial detention are cognizable under the Fourth Amendment rather than the Due Process Clause and, for this reason, summary judgment on Plaintiff's due process claims are proper." Again, Plaintiff fails to respond whatsoever to this argument.

"Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must

---

[49] Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir. 1999), *abrogated on other grounds*, Castellano v. Fragozo, 352 F.3d 939 (5th Cir. 2003) (en banc).

be the guide for analyzing these claims."[50] Here, Plaintiff's claims for wrongful arrest and pre-trial detention are clearly rooted in the language of the Fourth Amendment's protections against unlawful seizure. Plaintiff fails to provide any argument to the contrary. Further, this Court found that Defendant Stephens is entitled to qualified immunity as it relates to Plaintiff's due process claim for the single-photo lineup. Accordingly, Plaintiff's due process claims against Defendant Stephens are dismissed.

### VII. Equal Protection Claim is Insufficiently Pleaded and Lacks Evidentiary Support

Defendant asks for dismissal of Plaintiff's Fourteenth Amendment equal protection claims against him. Defendant Stephens argues that Plaintiff's pleadings merely offer conclusory statements and labels and fail to elaborate on the causal connection between his alleged mistreatment and his membership in a protected class. Plaintiff fails to acknowledge or even address this argument. Instead, this Court was forced to assess the scant evidence Plaintiff supplied with his opposition to evaluate Defendant's arguments regarding the equal protection claim. The Court finds that the declarations of Plaintiff's trial attorneys are somewhat relevant to his equal protection claim, so the Court considers them in the context of this argument.[51]

To succeed on a claim of racial discrimination under the Equal Protection Clause and § 1983, the plaintiff must show that he "received treatment different from that received by similarly situated individuals and that the

---

[50] Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted).

[51] The Court notes that Plaintiff only cited these declaration three times in his brief, and each time it was in support of conclusory allegations like, "[h]e was charged through the use of a completely unnecessary and unconstitutional single-photo array," (Doc. 88 at 2) or, "[h]ere, like in *Martin*, it was completely unnecessary for Stephens to show Crain a single-photo array of Magee presumably based on a 'common tattoo.'" (*Id*. at 10).

16

unequal treatment stemmed from a discriminatory intent."[52] Plaintiff submits the declarations of Rachel and Timothy Yazbeck, his trial attorneys. These declarations state that, prior to his trial, the attorneys met with District Attorney Walter Reed regarding the 60-year sentence offered to Plaintiff as part of a plea deal. According to them, "Mr. Reed was uninterested in discussing the evidence and reasoning for the 60-year offer, but specifically sought to confirm that Mr. Magee was African-American."[53] Upon confirming that Plaintiff is African-American, Mr. Reed advised that "if he doesn't want the deal, fuck him, we'll give him life."[54] These declarations, however, fail to create a factual dispute sufficient to withstand summary judgment.

Plaintiff fails to provide any evidence or argument as to how or why he was treated differently from similarly-situated individuals. Simply put, there is no evidence before the Court that Plaintiff was treated differently because of his race. Moreover, the declarations of Plaintiff's trial attorneys do not implicate Defendant Stephens; at most, they implicate Defendant Walter Reed. Accordingly, Plaintiff's equal protection claims against Defendant Stephens are dismissed.

### VIII. Official Capacity Claims are Redundant

Defendant also seeks dismissal of the official capacity claims against him. Defendant notes that Plaintiff sued Sheriff Smith in his official capacity. "When, as in this case, the Sheriff is a defendant in the litigation, claims against specific individuals in their official capacities are redundant, and it is

---

[52] Bowlby v. City of Aberdeen, 681 F.3d 215, 227 (5th Cir. 2012).
[53] Doc. 88-2 at 2.
[54] *Id.*

17

appropriate to dismiss them."[55] Plaintiff does not address this argument. Accordingly, Plaintiff's official capacity claims against Defendant Stephens are dismissed.

## IX. State Law Claims are Prescribed

Finally, Defendant Stephens seeks dismissal of Plaintiff's state law claims against him. Defendant argues that all of Plaintiff's state law claims are prescribed except for his state law malicious prosecution claim. In the alternative, Defendant asks this Court to decline to exercise its jurisdiction over Plaintiff's state law claims. Again, Plaintiff fails entirely to acknowledge or address this argument.

Plaintiff brings state law claims against Defendant Stephens for false arrest, false imprisonment, and malicious prosecution. Defendant correctly notes that these actions have a one-year prescriptive period, and because they are state law claims, prescription begins to run "from the day injury or damage is sustained."[56] Plaintiff's arrest occurred in August 2011, and he was detained from that point through his trial. Plaintiff's detention was predicated by his arrest. Plaintiff's false imprisonment and arrest claims, therefore, prescribed in August 2012—one year from when his injury or damage was sustained.

As to Plaintiff's malicious prosecution claim, however, prescription commences to run from the date of termination of the criminal proceedings in favor of Plaintiff.[57] Defendant acknowledges that Plaintiff filed his original complaint within one year of his acquittal. Accordingly, Plaintiff's state law malicious prosecution claim has not prescribed. Defendant Stephens argues,

---

[55] Donahue v. Strain, No. CV 15-6036, 2017 WL 3311241, at *16 (E.D. La. Aug. 3, 2017) (citing Castro Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001)).
[56] LA. CIV. CODE art. 3492.
[57] Miller v. Desoto Reg'l Health Sys., 128 So. 3d 649, 656 (La. App. 3 Cir. 2013).

18

however, that "Plaintiff cannot present evidence to support this claim as probable cause existed at every step of this proceeding from the swearing of Det. Stephens' affidavit for arrest warrant through trial."[58] As to the conduct of Defendant Stephens, this Court agrees. The Court has already established that Defendant Stephens had a good faith, reasonable belief that probable cause existed when he executed his arrest warrant application. Plaintiff's subsequent arrest and detention, therefore, are likewise predicated on probable cause. The Court notes that this analysis may not be the same for the other Defendants in this matter, but as it relates to Defendant Stephens, Plaintiff has failed to demonstrate any disputed issue of fact regarding his state law malicious prosecution claim. It is, accordingly, dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Brandon Stephens' Motion for Summary Judgment (Doc. 83) is **GRANTED**, and all of Plaintiff's claims against him are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 29th day of May, 2020.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[58] Doc. 83-3.